E-FILED
Friday, 17 February, 2017  01:24:43 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | |
|---|---|
| **DRISS EL-AKRICH,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **-vs-** | ) |
| | ) No.: IM-3041 |
| **UNIVERSITY OF ILLINOIS** | ) |
| **SPRINGFIELD, BOARD OF** | ) |
| **TRUSTEES OF THE UNIVERSITY** | ) |
| **OF ILLINOIS, KAREN MORANSKI,** | ) **FILED** |
| **Associate Vice-Chancellor, in her** | ) |
| **Official and Individual Capacity;** | ) FEB 15 2017 |
| **JONATHAN GOLDBERGBELLE,** | ) |
| **Senior Director of International** | ) CLERK OF THE COURT |
| **Programs and Internships, in his** | ) U.S. DISTRICT COURT |
| **Official and Individual Capacity;** | ) CENTRAL DISTRICT OF ILLINOIS |
| **LAURA ALEXANDER, Senior Director** | ) |
| **Human Resources, in her Official** | ) |
| **and Individual Capacity;** | ) |
| **DONNA MCNEELY, Executive Director** | ) |
| **of the University Ethics and Compliance** | ) |
| **Office, in her Official and** | ) **JURY TRIAL** |
| **Individual Capacity,** | ) **DEMANDED** |
| | ) |
| **Defendant(s).** | ) |

## COMPLAINT AT LAW

Now comes, Plaintiff, Driss El-Akrich, by and through her attorneys of record, S. Mona

Ahsan and Kathryn E. Eisenhart and for his Complaint at Law, states as follows:

## NATURE OF THE ACTION

1. This action is brought to remedy unlawful discrimination practices on the basis of National

    Origin and Religion and for Retaliation under Title VII of the Civil Rights Act of 1964, as

    amended, 42 U.S.C. § 2000e *et seq.*; State Officials and Employees Ethics Act 5 ILCS

    430/15-5 *et seq.*; Whistleblower Act, 740 ILCS 174/1 *et seq.*, and for breach of contract.

2. Plaintiff seeks injunctive relief including, but not limited to: back pay and reinstatement to

    her prior position, other make-whole relief, compensatory damages against all Defendants,

1

and punitive damages against Defendants Moranski and GoldbergBelle and others as they

become known during discovery.

## JURISDICTION AND VENUE

3.  This Court has jurisdiction pursuant to 28 U.S.C. §§1331 and 1343 and 42 U.S.C. § 2000e-

5(f)(3). Supplemental jurisdiction is conferred by 28 U.S.C. §1367 for Plaintiff's state law

causes of action.

4.  Venue is proper in the Springfield Division of the Central District of Illinois because the

employment practices hereafter alleged to be unlawful were committed within this judicial

district.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

5.  Plaintiff has exhausted all of his administrative remedies prior to bringing this lawsuit.

6.  Plaintiff filed a timely charge of discrimination based on National Origin and Retaliation

with the Equal Employment Opportunity Commission ("EEOC") and received a right to sue

letter from the EEOC on Nov 19, 2016, a true and correct copy of which is attached as

Plaintiff's EXHIBIT A. The right to sue letter was issued as a result of the charge of

discrimination filed by the Plaintiff and received by the EEOC on May 11, 2016, a true and

correct copy of which is attached as Plaintiff's EXHIBIT B. All allegations of the charges

and exhibits are incorporated by reference hereto.

7.  Plaintiff filed a timely charge of discrimination based on Religion with the Equal

Employment Opportunity Commission ("EEOC") and received a right to sue letter from the

EEOC on December 8, 2016, a true and correct copy of which is attached as Plaintiff's

EXHIBIT C. The right to sue letter was issued as a result of the charge of discrimination filed

by the Plaintiff and received by the EEOC on May 23, 2016, a true and correct copy of which

2

is attached as Plaintiff's EXHIBIT D. All allegations of said charges and exhibits are incorporated by reference hereto.

8. Plaintiff, Driss El-Akrich, (El-Akrich) is a Doctoral Candidate from Morocco, on a student visa, at the University who at the time of the events in question resides in Sangamon County, Illinois.

9. Plaintiff is an "employee" within the meaning of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et seq*.

10. During all relevant times, Defendants, Board of Trustees of the University of Illinois and The University of Illinois Springfield, collectively referred to as "the University" or "University", constitutes a corporation whose missions include teaching, research, and public service in many academic disciplines.

11. The University is a covered entity within the meaning of the Civil Rights Act of 1866. The University is an employer engaged in an industry affecting commerce within the meaning of Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g) and (h).

12. At all relevant times, Defendant Susan Koch was the Chancellor of the University of Illinois Springfield.

13. At all relevant times, Defendant Karen Moranski (Moranski) was the Associate Vice-Chancellor of Undergraduate Education at the University of Illinois Springfield.

14. At all relevant times, Defendant Jonathan GoldbergBelle (GoldbergBelle) was the Senior Director of International Programs and Internships.

15. At all relevant times, Defendant Laura Alexander (Alexander) was the Senior Director of Human Resources.

16. At all relevant times, Defendant Donna McNeely (McNeely) was the Director of the University Ethics and Compliance Office.

## STATEMENT OF FACTS

17. Plaintiff began his employment with the University as a part time Adjunct Instructor on August 16, 2011, to teach in the Intensive English Program (IEP) at the Center for Teaching and Learning (CTL). The Intensive English Program (IEP) was located within the CTL which also consisted of university wide tutoring programs. At this time, CTL was in College of Liberal Arts and Sciences (CLAS) and the Dean of CLAS, James Ermatinger (Dean) was in charge of IEP.

18. August 16, 2011, Plaintiff was first hired by Ms. Dana Atwell (Atwell), Associate Director and English as a Second Language (ESL) Coordinator, who was his immediate supervisor until about June 2013, when Atwell left the program. After June 2013 through July 15, 2015, the Dean of CLAS was his immediate supervisor and from July 15, 2015 till April 27, 2016, GoldbergBelle was his immediate supervisor.

19. The purpose of an Intensive English Program (IEP) is to provide high quality teaching of English to speakers of other languages. That is to provide non-native speakers the language skills they need to study at an American university.

20. The courses in IEP are non-credit bearing and completion of the program does not guarantee admission into the University. Students need to receive a passing score on an English proficiency test to gain admission into the University. They may take the University examination, Michigan English Language Institute College English Test (MELICET), offered each semester or an acceptable test from an outside source such as Test of English as a Foreign Language (TOEFL).

21. Therefore, the purpose of IEP is to prepare these non-native speakers to pass one of the tests in order to be admitted into the University.

22. It was the University's policy that successful completion of the IEP curriculum did not fulfill the English proficiency requirements for international students; instead, students were required to take the aforementioned tests to enroll in the University.

23. Plaintiff is a qualified professional in second language learning; he has a Bachelor's degree is in Applied Linguistics with a concentration on second language learning. He has two Master's degrees and a Certification in Communication. Presently, Plaintiff is a Doctoral candidate at the University, has completed all of his course work and is considered "all but dissertation" (ABD). He has 15 years of second language learning experience. He is fluent in three languages; English, Arabic and French.  He also has 12 years' experience teaching in IEP/ESL programs. Prior to coming the University, Plaintiff taught at Arkansas State University in its accredited ESL program and at the ESL program at Lincoln Land Community College and is familiar with the standards for IEP accreditation.

24. From August 16, 2011 until June 16, 2013, Plaintiff was a part-time Adjunct Instructor.

25. On June15, 2013, Plaintiff was promoted to Interim Director IEP, to provide leadership for and oversight of the IEP and setting up policies and procedures as required by the Commission on English Language Program Accreditation (CEA) for the IEP. It was the University's plan to seek and acquire CEA accreditation for the IEP and to meet the same standards as the IEP/ESL programs at the University's Chicago and Urbana campuses. He was in charge of strategic planning, including program development, curriculum and assessment, hiring, supervision and to provide overall training and professional development

5

for faculty and support staff. His job description also entailed promoting and actively recruiting for IEP by negotiations with foreign governments and agencies.

26. In March of 2013, before Atwell left, Plaintiff was sent as University liaison to Saudi Arabian Cultural Mission (SACM) in Washington D.C., because he was a native Arabic speaker and Muslim; therefore, he understood the Middle Eastern culture and the needs of Saudi students and the requirements of the University. He was sent to SACM to request that the University and the IEP be placed on SACM's list of approved colleges. This visit was approved by the Dean.

27. SACM provides scholarships and stipends for Saudi students but only if the students attend Universities and Programs on the list approved by SACM. Plaintiff believed this would increase enrollment and add diversity at the University, as per University's own numerous directives. Plaintiff obtained approval for students to attend the University and IEP from SACM at the time of his visit.

28. Based on the approval from SCAM the IEP grew from 8 – 10 students to 55 – 60 students per semester over the next two years.

29. The faculty members increased from 3 to 9.

30. In January 2014, it was decided by the Dean, with the approval of the Provost and Vice-Chancellor, Lynn Pardie, (Provost), that the IEP should hire Jacqueline Tanner (Tanner), as a Visiting Clinical Instructor, to develop the policies and procedures so as to seek accreditation from the Commission on English Language Program Accreditation (CEA).

31. On December 2, 2014, based upon the rapid growth of the IEP and the effort to obtain CEA accreditation, the Dean requested that three full-time faculty be hired.

32. On July 1, 2015, the IEP underwent a re-organization; it moved under the Center for
Academic Success (CAS) and under GoldbergBelle. GoldbergBelle reported directly to
Moranski and Plaintiff remained the Interim Director of IEP.

33. In April 2015, prior to IEP being transferred to CAS, an assessment of the IEP was done by
GoldbergBelle. The Provost, Lynn Pardie, wanted all the departments under Center for
Academic Success (CAS) assessed.

34. During his assessment interview, GoldbergBelle focused his assessment interview with
Plaintiff regarding the duties that Plaintiff performed as the Interim Director versus the duties
that Tanner performed. GoldbergBelle inquired about the Program's growth, the Middle
Eastern students and what were the future goals of the Program. Plaintiff explained to
GoldbergBelle that CEA guidelines for assessing students were based on direct evidence
demonstrating how well a student met the student's learning outcomes in a given course or at
a given level.  Direct evidence included standardized test, comprehensive exams, portfolios,
rubrics, or scales, but did not include attendance.

35. On or about August 3, 2015, Plaintiff, along with Tanner, met with Moranski and reported
discriminatory behavior by GoldbergBelle and his Program Coordinator, Barbara Sykes
(Sykes).  This complaint dealt specifically with discriminatory actions by them against the
exchange students in the Proyecta program from Mexico and himself.  The Proyecta program
was a short term program for Mexican students to come to the University for a month to
study English.  It was a program initiated by President Obama and the Mexican government.

36. During that meeting, Plaintiff reported that GoldbergBelle treated him very differently than
his predecessor, who was a Jewish woman, and that it was his opinion that such treatment
was based upon his national origin and religion (Middle Eastern and Muslim).

37. Plaintiff reported that GoldbergBelle initially refused to issue visas for the Mexican students claiming, "it was too much work" and later stopped him from collecting fees from the students. GoldbergBelle insisted that according to the University's Chief Financial Officer (CFO) the University does not accept cash.

38. Plaintiff verified this with the CFO who had no recollection of speaking with GoldbergBelle about this issue. Instead, Plaintiff was assured that the University does accept cash.

39. Upon learning Plaintiff was collecting fees from students and taking cash to the cashier's office GoldbergBelle insisted that his Business Administrative Assistant, Linette Hughes, (Hughes) and Ashley Towel, (Towel) his Staff Clerk, accompany Plaintiff.

40. Plaintiff also complained that GoldbergBelle would not allow Plaintiff to pay for transportation out of those funds for the Mexican students to go to St. Louis Airport. GoldbergBelle stated that they should find their own way. Yet, GoldbergBelle always provide transportation for his Asian exchange students.

41. Moranski did not investigate the complaints of discrimination.

42. On September 11, 2015, GoldbergBelle sent Plaintiff the Assessment Report in which he referred to Plaintiff as the "Coordinator" instead of the Interim Director.

43. Defendant GoldbergBelle stated that from now on he, GoldbergBelle would conduct all the IEP faculty meetings contrary to the IEP procedures and CEA guidelines.

44. GoldbergBelle completely changed Plaintiff's job duties in the Assessment Report. He decided that all hiring in the IEP would be done under his direction contrary to the duties outlined for the IEP director per the CEA guidelines.

45. In this Assessment Report, GoldbergBelle took over Plaintiff's duties, i.e., he made himself responsible for duties previously assigned to the Director of IEP. All Plaintiff's

8

responsibilities as Interim Director were now supervised by White non- Muslim Americans by either Defendant GoldbergBelle himself or Tanner. The only job Plaintiff was allowed to do unsupervised was to conduct a Faculty Development Seminar.

46. On October 21, 2015, GoldbergBelle sent an email stating that all teachers were to send absences and grades to him as he would soon be in-charge of issuing visas for all IEP students. He stated, that as International Programs Senior Director he would also be responsible for terminating those students who failed to make satisfactory progress in the IEP program.  EXHIBIT E.

47. GoldbergBelle focused on Middle Eastern student absences and insisted that teachers report such absences directly to him bypassing Plaintiff in contravention of the practices of IEP and the CEA guidelines. This obstructed Plaintiff's ability to perform his responsibilities.

48. Sue Alexander (Sue) and Rebecca Damery (Damery), adjunct faculty, were reporting their student class absences only to GoldbergBelle.

49. GoldbergBelle treated Plaintiff with a lot of suspicion even though Plaintiff was following the same procedures for reporting student absences as his Jewish female predecessor.

50.  GoldbergBelle told Plaintiff that he should have deported a Middle Eastern student when he had missed more than one class. However, GoldbergBelle was not concerned when two Chinese students were gone for almost an entire semester. Nor was he concerned when a Vietnamese student, in summer of 2015, took the placement test and then disappeared until the fall semester.

51. Defendants GoldbergBelle and Moranski showed they were prejudiced against Plaintiff when they never addressed him as the IEP Interim Director; instead, they referred to him as "the coordinator."

52. Plaintiff reported insubordination by Sue to both Defendants, GoldbergBelle and Moranski, during the first session in Fall 2015. Plaintiff stated Sue told him she was reporting absences to GoldbergBelle and not to him because it was a matter of "Homeland Security" and that it was "the American Way."

53. When Plaintiff had invited Sue into his office she stated that she didn't feel safe coming by herself. Damery, also an adjunct instructor, had to come in with her.

54. Plaintiff stated that GoldbergBelle and the IEP faculty had been informed numerous times that Saudi students were required to take the International English Language Testing System, (IELTS) examination once a month to maintain their scholarship from their government. This test was not offered in Springfield, therefore, the students were forced to travel, sometimes out of state to take the test. Such absences were supposed to be excused; however, some teachers still marked students absent.

55. On October 21, 2015, Tanner reported the discriminatory practices against Middle Eastern Muslim students and Plaintiff by GoldbergBelle to Ms. Lucia Vasquez, Assistant Dean of the College of Liberal Arts and Sciences.

56. In October 2015, Goldberg Belle's Business Administrator Hughes opened mail addressed to Plaintiff, without Plaintiff's permission or knowledge, and took out the tuition checks from SCAM. At no time did GoldbergBelle or Hughes notify Plaintiff that they were monitoring his mail and that they had intercepted mail from SCAM and taken the checks.

57. In early semester 2015, Plaintiff asked to hire a fulltime program assistant with knowledge of foreign language skills. This request was approved by Moranski. However, GoldbergBelle unilaterally removed the foreign language skills from the job description.  This search failed.

58. During Fall 2015, Plaintiff met with Moranski and reported that GoldbergBelle was not following established procedures under CEA guidelines and that he was being marginalized

10

by GoldbergBelle, who had created a hostile environment making it difficult for him to perform his job.

59. Plaintiff reported that Hughes would not allow him to purchase any routine items for the IEP unless approved by GoldbergBelle. It had become a challenge to order: Placement Tests, renew TESOL memberships, pay for pizza for the student welcoming party, and even purchase Kleenex and basic office supplies. Hughes would correspond with Tanner but not carbon copy Plaintiff, as was customary.

60. Tanner reported to Plaintiff that Damery refused to allow a Middle Eastern Muslim student to attend her class even though he was on her class roster. Damery ordered him to get a note from the IEP office to verify that he was correctly placed in her class, even though she knew there was no staff in the office.

61. Plaintiff noted disparity between grades and progression reports received by two Middle Eastern Muslim male students and a female Vietnamese student in Sue's class. All three students had failing grades, yet Sue had promoted the Vietnamese student but not the two Middle Eastern students.

62. The Middle Eastern student who had been kicked out of Damery's class complained to Tanner about Damery's treatment and Tanner forwarded the complaint to Plaintiff.

63. Tanner reported to Plaintiff that on the same day that Damery kicked out the Middle Eastern Muslim student, Damery allowed a Chinese student to remain in a class even though there was a question as to whether she was at the correct class level. Damery did not order the Chinese student to get a note from the office.

64. Tanner told Plaintiff that on November 13, 2015, Middle Eastern Muslim students had come to her office and complained about treatment by certain IEP faculty including Sue and Damery. Tanner delivered the complaints to Plaintiff on November 16, 2015.

11

65. In Fall 2015, a Chinese student worker reported that Damery approached her and invited her to join her church. Plaintiff reported this to Moranksi in October and Moranski indicated she would discuss the complaint of possible religious discrimination with University attorneys.

66. On November 25, 2015, Plaintiff reported the students' complaints of discrimination to Moranski and GoldbergBelle during a meeting dealing with hiring faculty with prior teaching experience in a CEA accredited program.

67. At that meeting Plaintiff gave Defendants copies of resumes of three potential new hires of faculty members that were experienced in teaching at CEA accredited programs. Both GoldbergBelle and Moranski confirmed that they would be fine. As a result of the meeting it was Plaintiff's understanding that Moranski and GoldbergBelle had agreed to hire 3 new CEA experienced faculty for Spring 2016.

68. On December 14, 2015, GoldbergBelle sent Plaintiff an email informing him that it was too late to hire new teachers for Spring 2016, and that he needed a schedule prior to December 30, 2015. GoldbergBelle was scheduled to depart for an overseas trip to Thailand on January 1, 2016.

69. Based on GoldbergBelle's instructions on December 22, 2015, Plaintiff requested Tanner draft a preliminary teaching and course schedule for the Spring 2016. This preliminary schedule did not include Sue or Damery as per Plaintiff's direction as he was under the impression that Moranski and GoldbergBelle had agreed not to reissue them contracts until the student complaints had been addressed. Plaintiff submitted the preliminary schedule to Defendants GoldbergBelle and Moranski for approval.

70. On December 23, 2015, Plaintiff was informed that Moranski had decided to give Sue and Damery one course each for the Spring Term. The schedule was amended and sent to Plaintiff for submission to Moranski and GoldbergBelle.

71. In an email on December 23, 2015, Moranski stated that it was her decision to determine who was going to teach and that Alexander and Damery were each to have a class. See EXHIBIT F.

72. On January 4, 2016, Plaintiff met with Provost Lynn Pardie and reported in detail the discrimination faced by the Middle Eastern Muslim students and himself in the IEP Department. He complained about the hostile environment of suspicion and harassment perpetuated by GoldbergBelle, his staff and the insubordination of adjuncts, Sue and Damery, that was making it very stressful for him to perform his duties. The Provost requested permission to share these concerns with Moranski and Plaintiff consented.

73. On January 6, 2016, Plaintiff received an email addressed to both GoldbergBelle and him and carbon copied to Moranski and the Provost from Laura Alexander (Alexander) Senior Director of Human Resources, stating that Sue and Damery had complained that their hours had been reduced for the spring semester in retaliation. Alexander wanted to meet with Plaintiff to discuss the "business rational" to defuse the perception of retaliation.

74. On January 7, 2016, Plaintiff emailed Moranski and inquired whether it would be okay to meet with Alexander to explain the business rational and the procedures in the IEP.

75. The same day, GoldbergBelle told Plaintiff he should not respond to Alexander until he [GoldbergBelle] had a chance to discuss it with Moranski. Further, he instructed Plaintiff not to contact Sue or Damery.

76. Plaintiff told GoldbergBelle that he had substantial evidence to refute the unfounded retaliation allegations and felt comfortable relating them to Alexander, therefore, he would like permission to go to Human Resources.

77. Within the same hour, Moranski emailed Plaintiff and instructed him to follow GoldbergBelle's advice and not contact Alexander. Moranski stated that GoldbergBelle, not

13

Plaintiff, would contact Alexander in Human Resources. Moranski said she would address
the issue at the administrative level. Moranski stated that contact, "should not happen until
Jonathan and I have consulted appropriately with the right people. Right now you need to
hold back and wait to hear for Jonathan." EXHIBIT G

78. That same week, GoldbergBelle called Plaintiff and told him not to talk to anyone about the
retaliation allegations. In another phone call he told Plaintiff that since Damery had not
accepted her contract, Plaintiff should give that class to Sue. Plaintiff complied.

79. On January 19, 2016, Plaintiff got an email from Donna McNeely, Executive Director of the
Ethics and Compliance Office to meet to with her to address concerns with IEP.

80. On January 25, 2016, Plaintiff met with Donna McNeely and Traci Roth, Associate Director
of Ethics. Plaintiff was asked questions regarding the program and its procedures particularly
the class scheduling process. McNeely wanted to know why Sue and Damery were not
included in the preliminary schedule and why Sue and Damery's hours were reduced for
Spring 2016. She inquired about the growth of the program due to increase in the Middle
Eastern students. Plaintiff read Moranski's email in which she stated that she will make the
final determination regarding the Spring 2016 schedule. Plaintiff showed the Middle Eastern
Muslim student complaints against Sue and Damery, however, McNeely would not look at
them. Plaintiff reported the discrimination and the hostile environment created by
GoldbergBelle and Moranski against himself and the Middle Eastern Muslim students in
detail to McNeely.

81. On February 4, 2016, in a meeting held to discuss the IEP purchasing procedures,
GoldbergeBelle refused to give IEP Program Assistant, Badaria Luteify, a Middle Eastern
Muslim, (Luteify) University credit cards. These were the same cards given previously to the
white Christian IEP Program Assistant.

82. Plaintiff reported this to the Associate Chancellor for Public Affairs Ryan Croke (Croke).

83. Plaintiff also informed Croke about discrimination against the Middle Eastern students by GoldbergBelle's Program Coordinator, Skyes. Skyes was complaining that she feared for her safety when Middle Eastern men were dropped off their wives in front of the library. She stated that the IEP students were breaking the rules and that the next time she saw them break the rules she would contact the police.

84. On February 23, 2016, Moranski, came to Plaintiff's office. Plaintiff complained about GoldbergBelle's treatment of Luteify, and that the environment was too hostile for him to perform his duties; therefore, he stated he was going to the EEOC. At which point Moranski, turned red and stated that she wouldn't support Plaintiff if he went to EEOC and left his office.

85. On February 29, 2016, Moranski and GoldbergBelle met with Plaintiff and handed him a letter stating that McNeely had found him guilty of retaliation and that he was being placed on administrative leave effective immediately.  Plaintiff was told to hand in his keys to his office and leave the campus. He was told that he was to have no contact with anyone from the University, not even for his doctoral studies. He was told to meet his dissertation faculty advisor off campus.

86. On March 3, Plaintiff met with Alexander and Moranski in the Human Resources Office. Alexander wanted to know why Sue and Damery were not on the preliminary schedule and why their hours were reduced in Spring 2016. Plaintiff read her Moranski's email, in which Moranski stated that she was going to decide who to hire for Spring 2016. Plaintiff then gave Alexander a copy.  Plaintiff also shared the Middle Eastern Muslim students' complaints regarding the adjuncts with Alexander.

15

87. Plaintiff explained that in November 2015, he had shared these student complaints against Sue and Damery in a meeting with GoldbergBelle and Moranski. Moreover, he had given GoldbergBelle and Moranski resumes of three faculty candidates with experience teaching in CEA accredited programs to hire for Spring 2016.

88. Plaintiff told Alexander it was his understanding since there were unresolved issues regarding Sue and Damery they were not supposed to be on the schedule until these were resolved. Plaintiff also informed Alexander that the adjuncts were not complying with the CEA guidelines and IEP procedures for reporting and progression; they were reporting student absences directly to GoldbergBelle and keeping Plaintiff out of the loop. Sue's explanation was, "it was for homeland security" and "the American way." Plaintiff also reported that Sue and Damery's teaching and testing methods did not comply with CEA guidelines and despite being counseled they choose not to comply. Plaintiff feared these actions would harm the CEA accreditation process.

89. Plaintiff elaborated with as much detail possible in the limited time provided about the hostile environment perpetuated by GoldbergBelle in IEP. He also told Alexander that he had complained to Moranski and others at the University on numerous occasions.

90. Plaintiff informed Alexander that he did not have independent authority to hire anyone without GoldbergBelle and Moranski's approval. All contracts were drafted and signed by GoldbergBelle.

91. On March 18, 2016, Plaintiff received Alexander's Recommendation Letter from Moranski via email. It was Alexander's determination that Plaintiff was solely responsible for retaliation against Sue and Damery. Among other things, she recommended that Plaintiff should be terminated immediately. Alexander praised Moranski and GoldbergBelle and

stated that it was only intervention by Moranski and GoldbergBelle that Sue and Damery
were able to teach any courses in Spring 2016.

92. On March 21, 2016, Plaintiff and Tanner met and verbally reported to Deanie Brown,
(Brown) Associate Chancellor, Office of Access and Equal Opportunity, about the
discrimination against Plaintiff by GoldbergBelle, the discrimination against the Middle
Eastern Muslim students, and the pre-textual retaliation claim brought against them for
reporting the discrimination. Brown told Plaintiff she understands, "how he felt being
marginalized."

93. On March 22, 2016, Tanner put her claims of discrimination against El-Akrich and the
Middle Eastern Muslim students and the retaliation against her in writing via email to Brown.

94. On April 15, 2016, Tanner again met with Brown. Ms. Brown refused to meet with Plaintiff
despite his email requests. At this point, Tanner and Plaintiff both were still on administrative
leave. Tanner told Brown she was considering filing a complaint with the EEOC. Brown
asked her not to file a formal complaint while she advocated to rectify Tanner's situation.

95. On April 27, 2016, Moranski sent an email to Plaintiff informing him that he may return to
active work status through the completion of his contract May 15, 2016. However, his duties
would be separate from IEP and his contract would not be renewed. He was instructed to
work from home, and obtain prior approval from Moranski for all University visits. He was
also told not to contact anyone in IEP. Further, Plaintiff was instructed to forward all emails
and contacts to GoldbergBelle.

96. On May 28, 2016, Plaintiff became aware that GoldbergBelle had gained access to his
university email account without notice to him in violation of the University's policies and
procedures. Tanner had emailed Plaintiff and much to her astonishment she received an

17

automatic reply from GoldbergBelle, "I will be out of town until June 6th. I will be checking my email regularly."

97. On August 4, 2016, Plaintiff received an email from the Dean confirming that Moranski had authorized GoldbergBelle's access to Plaintiff's email account but that the access was removed by IT at the end of May. The email account was issued to him as a Doctoral Candidate originally and was the method used for his faculty dissertation advisor to contact and instruct him.

98. In August 2016, Moranski agreed to allow Tanner to enter her office to collect her personal belongings. Tanner's requested Moranski that Plaintiff also needed his personal belongings. Therefore, on August 2, 2016, Plaintiff was also able to enter his office to collect his personal belongings. He found that his office computer had been wiped clean before he could save his documents.

## COUNT I
## VIOLATION OF TITLE VII – NATIONAL ORIGIN

99. Plaintiff repeats and re-alleges all of the allegations set forth in paragraphs 1-98 in this Complaint as though they were contained herein.

100. Plaintiff is a member of a protected class (national origin-Middle Eastern/Moroccan) as defined by Title VII.

101. Throughout his employment, Plaintiff performed his job duties in a satisfactory manner consistent with his employer's reasonable expectations.

102. As detailed above, as a result of his national origin, the Plaintiff suffered numerous adverse employment actions during his time with the Defendants.

103. Defendants have discriminated against the Plaintiff by treating him differently from and less preferably than similarly-situated employees not within Plaintiff's protected class, and

18

furthermore by subjecting Plaintiff to discriminatory (lesser) pay and benefits, discriminatory terms and conditions of employment, and other forms of discrimination, in violation of Title VII.

104. Defendants' employees who engaged in the same conduct as Plaintiff, but were not in the same protected class, were not subjected to the same discrimination due to their national origin as the Plaintiff.

105. The discriminatory misconduct described above was the result of a willful or intentional effort on the part of the University to discriminate against the Plaintiff for reason of his national origin.

106. The University's unlawful conduct, as alleged above, caused Plaintiff substantial damages, including but not limited to: loss of employment, loss of past and future income and benefits, loss of earning capacity, emotional distress, loss of reputation, and humiliation and embarrassment. Plaintiff will continue to suffer these damages in the future.

107. That as a direct and proximate result of one or more of the above acts of intentional discrimination on the basis his national origin, Plaintiff has sustained damages equal to lost monetary damages, has suffered substantial embarrassment and damage to his professional reputation, emotional distress damages, and is entitled to compensatory damages, punitive damages, as well as attorneys' fees and costs.

## COUNT II
## VIOLATION OF TITLE VII - RELIGION

108. Plaintiff repeats and re-alleges all of the allegations set forth in paragraphs 1-98 in this Complaint as though they were contained herein.

109. Plaintiff is a member of a protected class (Muslim) as defined by Title VII.

110. Throughout his employment, Plaintiff performed his job duties in a satisfactory manner consistent with the Employer's reasonable expectations.

111. During the course of his employment, and as a result of his religion, Plaintiff has suffered from numerous adverse employment actions as detailed above.

112. The University has discriminated against Plaintiff, similarly-situated Muslim workers and Muslim students, by treating him differently from and less preferably than similarly-situated non-Muslim employees and by subjecting him to discriminatory (lesser) pay and benefits, discriminatory terms and conditions of employment, and other forms of discrimination, in violation of Title VII.

113. That the discriminatory misconduct described above was the result of a willful or intentional effort on the part of the University to discriminate against the Plaintiff for reason of his religion.

114. That as a direct and proximate result of one or more of the above acts of intentional discrimination on the basis of religion, Plaintiff has sustained damages equal to lost monetary damages, has suffered substantial embarrassment and damage to his professional reputation and emotional distress damages, and is entitled to compensatory damages, punitive damages, as well as attorneys' fees and costs.

115. The University's unlawful conduct, as alleged above, caused Plaintiff substantial damages, including but not limited to: loss of employment, loss of past and future income and benefits, loss of earning capacity, emotional distress, loss of reputation, and humiliation and embarrassment. Plaintiff will continue to suffer these damages in the future.

## COUNT III
### VIOLATION OF TITLE VII - RETALIATION

116. Plaintiff repeats and re-alleges all of the allegations set forth in paragraphs 1-98 in this Complaint as though they were contained herein.

117. Title VII makes it unlawful for an employer to discriminate against an employee because he or she has opposed any practice made an unlawful by Title VII, or if he or she has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII.

118. Throughout his employment, Plaintiff performed his job duties in a satisfactory manner consistent with the University's reasonable expectations.

119. Plaintiff asserts that being placed on administrative leave, being removed from the IEP and having his contract not renewed was the result of retaliation against him by Defendants as a result of his complaints of discrimination towards himself and towards the IEP Middle Eastern Muslim students by some of the IEP instructors and perpetuated by the actions of GoldbergBelle and Moranski. Further, Plaintiff asserts that on February 23, 2016, he told Defendant Moranski about GoldbergBelle's discriminatory treatment and that the environment was too hostile for him to perform his duties.

120. There is a casual connection between the protected activity and the adverse employment action.

121. The Defendants have subjected Plaintiff to the above-described less favorable terms and conditions of employment, failed to take proper steps to address Plaintiff's complaints of discrimination and terminated Plaintiff's employment because of his protected activity in violation of Title VII.

122. As a direct and proximate result of one or more of the above acts of retaliation as

21

described above, Plaintiff has sustained damages equal to lost monetary damages, has

suffered substantial embarrassment and damage to her professional reputation, emotional

distress damages, destruction of personal property from his office and is entitled to

compensatory damages, punitive damages, as well as attorneys' fees and costs.

## COUNT IV
### CONSPIRACY UNDER SECTION 1985 U.S.C. §1985

123. Plaintiff repeats and re-alleges all of the allegations set forth in paragraphs 1-98 in this

Complaint as though they were contained herein.

124. All Defendants and other co-conspirators, known or not yet know to Plaintiff, reached an

agreement among themselves to remove Plaintiff from his position as the IEP Interim

Director of the IEP at the University in violation of Plaintiff's Constitutional rights as

described above.

125. In furtherance of the conspiracy each of the co-conspirators committed overt acts and was

a willful participant in joint activity.

126. This misconduct was objectively unreasonable and was undertaken intentionally with

willful indifference to Plaintiff's Constitutional rights.

127. As a direct and proximate result of the illicit agreement referenced above, Plaintiff's

rights were violated and he suffered substantial and irreparable harm, including loss of

income and benefits, loss of professional reputation, out of pocket expenses, attorneys'

fees and severe emotional distress.

## COUNT IV
### VIOLATION OF ILLINOIS STATE OFFICIALS AND EMPLOYEES ETHICS ACT
### (5 ILCS 430/15-10)

128. Plaintiff repeats and re-alleges all of the allegations set forth in paragraphs 1-98 in this Complaint as though they were contained herein.

129. The State Officials and Employees Act prohibits retaliatory action by a State agency or employee against a State employee because he or she 1) disclosed or threatened to disclose to a supervisor or to a public body and activity, policy or practice of any State agency or other State employee that the State employee reasonably believes is in violation of a law, rule, or regulation; or 2) provides information to any public body conducting an investigation, hearing or inquiry into violation of law, rule, or regulation by any State agency or State employee.

130. Defendants University of Illinois Springfield and the Board of Trustees of the University of Illinois are State agencies within the meaning of 5 ILCS 430/15-10.

131. Defendants Karen Moranski, Johnathan GoldbergBelle, Laura Alexander, and Donna McNeely are State employees within the meaning of 5 ILCS 430/15-10.

132. Pursuant to 5 ILCS 430/15-5 through 15-20, the actions against Plaintiff by the Defendants were adverse employment actions in retaliation for Plaintiff's protected activity as described herein. Plaintiff reasonably believed the activities, policies and practices at the University violated the laws, rules and regulations.

133. Plaintiff's protected activity was a contributing factor that caused such adverse actions to be taken against him.

134. Pursuant to 5 ILCS 430/15-25, Plaintiff is entitled to all remedies necessary to make him whole and prevent future violations of the Act, including, but not limited to: reinstatement to his previous position within the University, as well as reinstatement of full benefits and seniority rights, and reasonable attorneys' fees. In order to make him whole, Plaintiff also

seeks an award of compensatory damages for the severe emotional distress, loss of professional reputation and humiliation he has had to incur.

135. To prevent future violations of the Act, Plaintiff seeks an award of punitive damages against the Defendants.

**COUNT V**
**VIOLATION OF WHISTLEBLOWER ACT**
***ILCS 174/1 et. seq.***

136. Plaintiff repeats and re-alleges all of the allegations set forth in paragraphs 1-98 in this Complaint as though they were contained herein.

137. As set forth in the preceding paragraphs, Plaintiff engaged in activities for which government employees are protected from retaliation by the Whistleblower Act §15 when the employee discloses information where the employee has reasonable cause to believe that the information discloses a violation of State or federal law, rule, or regulation.

138. Plaintiff met with Provost, Lynn Pardie, in January 2016 and disclosed discriminatory conduct by Defendants GoldbergBelle and Moranski; insubordination based on discriminatory conduct by adjuncts Sue and Damery towards Plaintiff and discriminatory conduct towards IEP students by all Defendants. The same week pre-textual retaliatory allegations were brought against Plaintiff. On February 23, 2016, Plaintiff told Defendant Moranski that he was going to EEOC and within a couple of weeks he was removed from his position within IEP and placed on administrative leave; and soon thereafter determined guilty of retaliation. In April 2016, Plaintiff was informed by Moranski that he was back on fulltime status and could continue out his contract term to May 15, 2016, but that he was not allowed back in IEP. In fact, Plaintiff was not allowed on campus even to meet his faculty dissertation advisor unless those visits were approved by Moranski. Plaintiff

was also informed that contrary to Defendants' prior promises his contract would not be renewed.

139. Defendants' unlawful conduct, as alleged above, caused Plaintiff substantial damages, including but not limited to: loss of employment, loss of past and future income and benefits, loss of earning capacity, emotional distress, loss of reputation, and humiliation and embarrassment. Plaintiff will continue to suffer these damages in the future.

140. Defendants' unlawful conduct was intentional and undertaken with malice and reckless indifference to Plaintiff's rights under the Whistleblower Act, and Plaintiff therefore seeks awards of punitive damages against these defendants in order to deter them and others similarly situated individuals from such wrongful conduct in the future.

**COUNT VI**

**STATE LAW BREACH OF CONTRACT**

141. Plaintiff repeats and re-alleges all of the allegations set forth in paragraphs 1-98 in this Complaint as though they were contained herein.

142. As described above, Plaintiff formed a contract with Defendants University of Illinois Springfield and Board of Trustees by accepting their offer of continued employment on January 7, 2016. The term of the contract was from January 1, 2016 through May 15, 2016. On March 18, 2016, Plaintiff received Alexander's Recommendation Letter from Moranski via email. It was Alexander's determination that Plaintiff was solely responsible for retaliation against Sue and Damery. Among other things, she recommended that Plaintiff should be terminated immediately. On April 27, 2016, Plaintiff was informed by Defendant Moranski that he was back on full time status until the completion of his term and that his contract, contrary to Defendants prior promises,

would not be renewed.  Plaintiff wasn't allowed back in the IEP department or the University campus unless approved by Moranski.

143. Defendants' contractual obligations also included an obligation of good faith and fair dealing in performance of the contract, the University's own rules and regulations including University of Illinois Statutes and under the laws of the State of Illinois.

144. Plaintiff substantially performed all his contractual obligations required of him under the contract up to the time of breach.

145. Defendants violated their obligation of good faith and fair dealing as to the terms and conditions of that contract.

146. Plaintiff has suffered damages as a result of this breach including loss of income, benefits and other out-of-pocket costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court:

A.  Award damages to Plaintiff for loss of pay and benefits incurred as a result of the National Origin discrimination against him as alleged in this complaint, pursuant to and within the statutory limits under Title VII of the Civil Rights Act as well as incidental, consequential, and punitive damages;

B. Award damages to Plaintiff for loss of pay and benefits incurred as a result of the Religious Discrimination against him as alleged in this complaint, pursuant to and within the statutory limits under Title VII of the Civil Rights Act as well as incidental, consequential, and punitive damages;

C. Award damages to Plaintiff for loss of pay and benefits incurred as a result of the retaliation against him as alleged in this Complaint, pursuant to and within the statutory limits under Title VII of the Civil Rights Act as well as incidental, consequential, and punitive damages;

D. Enter a declaratory judgment that Defendants have unlawfully retaliated against Plaintiff in violation of the State Officials and Employees Ethics Act, 5 ILCS 430/15-10.

E. Grant Plaintiff a judgment for compensatory damages as to each count in an amount sufficient to fully compensate her, and grant Plaintiff a judgment against the Defendants GoldbergBelle, Moranski, Alexander, and McNeely for punitive damages;

F. Permanently enjoin the University from retaliating those who complain of discrimination by appointing a court monitor to prevent such wrongdoing;

G. Assess against the University and in favor of the Plaintiff such liquidated and exemplary damages as may be provided by law for the willful violations of the law committed by it;

H. Award Plaintiff damages for pain and suffering;

I. Award Plaintiff pre-judgment interest for the defined sum of wages and benefits lost;

J. Grant Plaintiff reasonable attorneys' fees, costs, and fees for experts; and

Grant Plaintiff such other relief as this Court deems necessary and proper.

PLAINTIFF DEMANDS TRIAL BY JURY.

DRISS EL-AKRICH
Plaintiff

By *S. Mona Ahsan*
S. Mona Ahsan
Attorney for the Plaintiff

S. Mona Ahsan #6236610
Law Office of Mona Ahsan
2901 Wildcat Court
Springfield, Il 62711
410-507-4443
mona@ahsan-law.com

Kathryn E. Eisenhart #6183716
Attorney for Plaintiff
Eisenhart Law Office
17 Hawthorne Lane
Springfield, IL 62712
217-679-6410
eisenhartlawoffice@gmail.com